<pre>
 1                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
 2

 3   _____ )
     UNITED STATES OF AMERICA,      ) No. 3:19-cr-00314-SRU-2
 4                                  )
                     Plaintiff,     ) January 31, 2023
 5   v.                             )
                                    ) 9:11 a.m.
 6   KHATIJA KHAN,                   )
                                    ) 915 Lafayette Boulevard
 7                   Defendant.     ) Bridgeport, Connecticut
     _____ )
 8

 9             RESTITUTION HEARING - VOLUME II

10   B E F O R E:

11         THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

12

     A P P E A R A N C E S:
13

14   FOR THE GOVERNMENT:

15         OFFICE OF THE UNITED STATES ATTORNEY
                1000 Lafayette Boulevard, 10th Floor
16              Bridgeport, CT 06604
                (203) 696-3000
17              E-mail: harold.chen@usdoj.gov
           BY: HAROLD H. CHEN, AUSA
18

19   FOR THE DEFENDANT:

20         JONATHAN J. EINHORN LAW OFFICES
                129 Whitney Avenue, Suite 1
21              New Haven, CT 06510
                E-mail: einhornlawoffice@gmail.com
22         BY: JONATHAN J. EINHORN, ESQ.

23

24
                Official Court Reporter:
25              Melissa J. Cianciullo, RDR, CRR, CRC
                (203) 606-1794
</pre>

```
1                    INDEX OF EXAMINATION

2

3    WITNESS:  KHATIJA KHAN                          PAGE

4    Direct Examination by Mr. Einhorn                54

5    Cross-Examination by Mr. Chen                    71

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to Order, 9:11 a.m.)
 2         THE COURT:  Good morning.
 3         MR. CHEN:  Good morning, your Honor.
 4         MR. EINHORN:  Good morning, your Honor.
 5         THE COURT:  I've received the defendant's
 6   motions for credits against restitution.  I thought I
 7   would comment in hopes of making the proceedings more
 8   efficient.
 9         Certainly if the victims' losses were reduced
10   by some benefit that they received, credits are
11   appropriate.  What is unclear to me -- obviously I
12   haven't heard the evidence yet, but it's unclear to
13   me whether the payments that Ms. Kahn claims to have
14   made did anything other than reduce her gain rather
15   than reduce the victims' loss in this sense.
16   Obviously if she paid out money, she -- her net was
17   less than it otherwise would have been.  But if, for
18   example, she paid a fee that was not of value to the
19   plaintiff, it didn't reduce her -- excuse me, didn't
20   reduce the plaintiff's loss.
21         So I would just ask everyone to focus on
22   whether there is any evidence that the payments that
23   were allegedly made resulted in a net reduction of
24   the loss to the plaintiff.
25         MR. EINHORN:  Okay.
```

```
 1            THE COURT:  Or to the victim.
 2            MR. CHEN:  Your Honor, if I just could be
 3    heard.  Hal Chen.
 4            I think that's exactly the point, your Honor.
 5    I mean, if you were to analogize to a real estate
 6    attorney, someone claiming to be a real estate
 7    attorney but who was not, helping individuals buy
 8    homes but they'd actually never recorded the deeds,
 9    they'd actually never executed the closing documents.
10    But in furtherance of that scheme, you know, they
11    paid and appraiser, they paid a title search company,
12    that would reduce the profit to the person committing
13    the fraud.  But at the end, the person who was paying
14    the fee never received anything.
15            And as Mr. Hernandez-Medina testified two
16    weeks before, even though he paid all this money, he
17    never got anything in return until he went to a
18    different lawyer.
19            MR. EINHORN:  We agree with your Honor's
20    analysis also, and I'll try and focus just on that --
21    on those issues.  Thank you.
22            THE COURT:  Sure.  All right.
23            MR. CHEN:  And if I could, just as a
24    housekeeping matter, the government just wanted to be
25    clear under the Victims' Rights Act, the victims have
```

1    been apprised of their right to be here but they have

2    declined other than Mr. Hernandez-Medina who appeared

3    for the first hearing.

4            THE COURT:  Very good.  Thank you.

5            Mr. Chen, is the government presenting any

6    additional evidence at this point, or are you going

7    to wait for the defense to present its evidence?

8            MR. CHEN:  The government will wait for

9    counsel to present.

10           THE COURT:  All right.  Very good.

11   Mr. Einhorn.

12           MR. EINHORN:  Well, actually, on that point,

13   I guess I expected the government would be putting on

14   evidence on the other five restitution claimants.  I

15   know last time we were here the government put in

16   exhibits for them.  I thought for the record perhaps

17   they'd like to elaborate on each one of the five --

18   the amounts and maybe just a handful of details on

19   each of the five claims for the record.  Otherwise,

20   it -- the record is baron of any details with the

21   exception of those exhibits.

22           MR. CHEN:  Your Honor, as the government

23   indicated prior to this hearing, this is a

24   restitution hearing.  This is not a trial.  There is

25   not a jury here.  And so the government is relying on

1    its brief and its submissions in Document 145, the

2    memo that was submitted, victim F.P.S. who is

3    claiming 6,185 in payments made to Ms. Kahn as

4    restitution; victim J.B.T.V., $5,500 in payments to

5    Ms. Kahn; E.H.M., who is Mr. Hernandez-Medina, a

6    total loss of $14,525; victims A.P.T. and A.M.G., a

7    total loss of $7,600 in cash; and victims L.P.B. and

8    N.B., a total loss of $7,100.  And, finally, victims

9    E.S. and D.C., a total loss here of $5,010.

10           As I believe I indicated at the prior

11   hearing, the government has provided to the Court

12   through the probation office all of the reports for

13   these victims.  So the government has provided the

14   Court a fulsome record on which the Court to base its

15   factual findings.

16           In addition, I should indicate this is not

17   just some hearing that's occurring in a vacuum.

18   There was a full criminal prosecution.  Ms. Kahn pled

19   guilty before your Honor to a very detailed plea

20   agreement in which she agreed to make restitution to

21   43 victims or so for $326,212 already.  That's also

22   substantiated by the very detailed presentence report

23   that was prepared by Officer Harte.

24           So because the Court's obligation is just to

25   make a finding based on preponderance, based on

1    evidence including hearsay and nontestimonial in

2    terms of a trial evidence, the government submits

3    there is plenty of evidence for the Court to make its

4    finding.

5         If your Honor wishes to hear more from

6    Special Agent Barry of the Department of Homeland

7    Security Homeland Security Investigations who is

8    present here, the government is happy to answer any

9    further questions of the Court.

10        But otherwise, the government respectfully

11   submits there is a very detailed record for which the

12   Court to make its finding that Ms. Kahn should make

13   restitution to the six additional victims who came

14   forward after she pled guilty in the amount of

15   $40,420.

16        THE COURT:  Mr. Einhorn.

17        MR. EINHORN:  Two things then, your Honor.

18   First of all, it's Ms. Kahn's intention to testify

19   briefly here this morning.

20        And, secondly, based on the government's

21   position on the nature of its proffer, the evidence

22   and the way it's offering its evidence, I would just

23   ask the Court for an opportunity to file a brief

24   memoranda.  I can have it filed actually by the end

25   of the day Friday, if that's okay.

```
 1              THE COURT:  That's fine.  Sure.

 2              MR. EINHORN:  Okay.  Thank you.

 3              THE COURT:  All right.  Ms. Kahn, let me just

 4    make sure that you understand you have no obligation

 5    to testify because you have the right to remain

 6    silent.  Do you understand?

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  And then anything you say on the

 9    stand under oath is of course going to be taken down

10    for the record and could be used against you in this

11    or some other case.  Do you understand that?

12              THE DEFENDANT:  Yes.

13              THE COURT:  There is also the concern that to

14    the extent that you are found to have been untruthful

15    in your sworn testimony, that would be a violation of

16    federal law that would subject you to potentially a

17    significant term of imprisonment either for making a

18    false statement or for perjury.  Do you understand?

19              THE DEFENDANT:  I do.

20              THE COURT:  All right.  Have you discussed

21    your decision to testify with Mr. Einhorn?

22              THE DEFENDANT:  Yes.

23              THE COURT:  All right.  And are you fully

24    aware of your rights in this respect?

25              THE DEFENDANT:  I am now.
```

```
 1              THE COURT:  Okay.  Very good.  Do you want to

 2   confer with Mr. Einhorn before you --

 3              MR. EINHORN:  Yes.  Thank you.

 4              THE COURT:  Please remain standing.  Raise

 5   your right hand.

 6              THE CLERK:  Do you solemnly swear or affirm

 7   that the testimony you shall give concerning the case

 8   now in question shall be the truth, the whole truth

 9   and nothing but the truth, so help you God?

10              THE DEFENDANT:  I do.

11              THE CLERK:  Please be seated and state your

12   name for the record.

13              THE DEFENDANT:  Khatija Khan.

14              MR. EINHORN:  Thank you, your Honor.

15                      DIRECT EXAMINATION

16   BY MR. EINHORN:

17     Q.    Ms. Kahn, first of all, before we get to

18   specifics, generally, when you received money from

19   various clients, and they're characterized obviously

20   as victims at this point, can you tell the Court

21   whether or not -- and I'm just talking generally here

22   now -- you used some of their money for legal

23   purposes?

24     A.    Yes, I did.

25     Q.    And can you just describe what sort of legal
```

1    purposes we're talking about?

2        A.    The attorney fees --

3        Q.    You have to speak up just a wee bit.

4        A.    The attorney fees, the legal fees, the

5    application fees, the translator's fees in case of

6    documentation needs to be translated.  That's what

7    the fees are used for.

8        Q.    Okay.  With regard to legal fees

9    specifically, was it just immigration fees or might

10   it be other legal issues clients might have?

11       A.    Yes.  They didn't come in just for

12   immigration.  They came in for criminal cases.  Some

13   had family concern -- family issues with their

14   children, family matters.  So that fee that says on

15   there, it just doesn't pertain to immigration fees

16   itself.  A lot of these individuals had criminal

17   cases as well.

18       Q.    All right.  And, secondly, and you mentioned

19   this generally, with regard to some of the moneys

20   that you received from these clients and victims, did

21   you use some of those moneys also for official

22   immigration fees?

23       A.    Yes, I did.

24       Q.    Okay.  All right.  Fine.  Now, with regard to

25   the six persons we have here today, you heard last

```
 1   time from Mr. Hernandez.
 2         MR. EINHORN:  Is it okay if I use -- I guess
 3   it's okay if I use his name since he was already --
 4   he testified.
 5         THE COURT:  Yes.
 6         MR. EINHORN:  Thank you.
 7   BY MR. EINHORN:
 8     Q.    You heard last time with regard to
 9   Mr. Hernandez.  Can you tell the Court whether or not
10   any of Mr. Hernandez's money went towards, I want to
11   say, real attorney's fees?
12     A.    Yes, they did.
13     Q.    And who, to who?
14     A.    Attorney Noyes.
15     Q.    Attorney Noyes?
16     A.    Yeah, Shernette Noyes.
17     Q.    And for what purpose were funds paid to
18   Attorney Noyes?
19     A.    For his adjustment of status for him, his
20   wife and his children.
21     Q.    Okay.  And how much was paid from his moneys
22   through you to Attorney Noyes?
23     A.    The check I had him make out, I had him make
24   them out directly to USCIS so he knows that they're
25   going to immigration department, that he's paying for
```

1   them directly.  And the checks -- everything that

2   came from him went to the Attorney Noyes.  And

3   additional to that, there were additional fees.

4   Those were paid for Attorney Noyes' work done by

5   other method of payment.

6       Q.   Are you able to tell the Court here this

7   morning -- I hope you're able to hear.  Sorry.

8           Are you able to tell the Court here this

9   morning how much was paid of his fees to Attorney

10  Noyes?

11      A.   Along with the checks, those were given by

12  him.  Those were presented that day.  As you seen,

13  they were made out to USCIS directly, and those were

14  paid for his fees.  They were -- those were handed

15  over to Attorney Noyes along with that.  I cannot

16  remember the exact amount, but there were a lot of

17  attorney fees.  Those was made payments from my money

18  to Attorney Noyes to handle her case.

19      Q.   Now, we've met.  Obviously anything we say

20  and do is confidential.  But after we've met and

21  discussed this, did you attempt to find proof and

22  reference of exactly how much was paid to Attorney

23  Noyes?

24      A.   Yes, I did.  I made the attempt.  And very

25  unfortunately, like the person that made the payment,

1   payments at that time, I don't have the way to

2   contact her because the situation -- because of my

3   case, I'm not able to reach out to people, those I

4   need to -- those I could have gotten the proof from.

5   So I don't have the full detailed proof that I can

6   provide for the -- all the people.  A lot of them,

7   those are on the list so . . .

8       Q.    Okay.  And with regard to this person you say

9   had access to this, is this person also under a

10  criminal investigation?

11      A.    Yes.

12      Q.    Okay.  Now, you also mentioned before I cut

13  you off, I think, about official immigration fees.

14  On Mr. Hernandez's behalf, were some checks paid from

15  his funds for immigration fees?

16      A.    Yes.

17          THE COURT:  Just to be clear, she said that

18  the checks were made out by him to USCIS.

19          MR. EINHORN:  Yes.  I'm sorry.

20          THE COURT:  So were those amounts included in

21  his claimed restitution amount?

22          MR. CHEN:  Yes.  There were some checks that

23  were made to USCIS that Mr. Hernandez-Medina made out

24  to that party, yes.  But nothing became of that, so

25  to speak.  Her representation did not result in any

```
 1   benefit to him.  He had to start anew with Ms. Noyes.
 2          THE WITNESS:  I'm sorry.  That attorney,
 3   Shernette Noyes, was one that I had -- she was part
 4   of the office.  She worked for the office.  And she
 5   was the one from my office handling his case.  He did
 6   not find her on her own -- on his own.  That was the
 7   attorney that I made sure was able to handle her case
 8   because I -- like he had said it himself, that he met
 9   me through an -- Jose Salmeron in 2014.  And I had
10   dealt with his case since then, like I had reviewed
11   his case by two different attorneys before, and they
12   both said that he is able to qualify to get work --
13   his green card here.  Despite the fact of how my
14   attorney was trying to, you know, show the difference
15   that how he's been defrauded by all these people.
16   And like it's a --
17   BY MR. EINHORN:
18     Q.   Well, please stay with my question for now.
19   We'll try and stay on the point.
20          So with regard then for the fees that were
21   paid to the immigration service, Homeland Securities,
22   do you know if Mr. Hernandez benefited by these at
23   all or were they all for nothing?
24     A.   They -- like -- it was proven that he just
25   got his green card through Attorney Noyes' office and
```

```
 1    as the work was promised, the work was done, and he

 2    did -- him and his family did get the green card from

 3    which nobody could -- would have done, which he did

 4    get the benefit that he deserved and which we showed

 5    him the way by Attorney Noyes.

 6        Q.    Now, I'm going to ask you to identify this,

 7    if you will.  What is it?

 8        A.    Matthew Collins.

 9        Q.    It's a check?

10        A.    Yes.

11        Q.    Is it drawn on your account?

12        A.    Yes.

13            MR. EINHORN:  Your Honor, I would offer this

14    exhibit check to Matthew Collins.

15            THE WITNESS:  That's --

16            MR. EINHORN:  I'll provide a copy to you.

17            MR. CHEN:  Are you going to mark it?

18            MR. EINHORN:  Yes.

19            MR. CHEN:  I have no objection, your Honor.

20            THE COURT:  We'll mark it as an exhibit,

21    Defense Exhibit A, and it's a full exhibit.

22            MR. EINHORN:  Thank you.  May I proceed while

23    it's being marked?

24            THE COURT:  Sure.

25    BY MR. EINHORN:
```

1    Q.    All right.  I just showed you a check that
2  you identified to Attorney Matthew Collins.  Who is
3  Attorney Matthew Collins?
4    A.    Attorney Matthew Collins was a criminal
5  attorney for one N.B.
6    Q.    N.B.?
7    A.    Yes.
8    Q.    Okay.  I'm probably mispronouncing it.  And
9  he was an attorney who represented one of these --
10    A.    One of the attorneys that represented.
11    Q.    -- six people, I guess is the best way to put
12  it?
13    A.    Yes.
14    Q.    Okay.  And --
15    A.    He was one of the attorneys.  There was
16  additional attorneys who worked on N.B.'s case, not
17  just immigration but criminal case as well.
18    Q.    Let's stay with Mr. Collins for a second.
19  That's a check from your account going to
20  Mr. Collins.  Why are you paying money to
21  Mr. Collins?
22    A.    For criminal case for N.B.
23    Q.    And the check is for $1,000.  Was more than
24  that paid to Mr. Collins?
25    A.    Yes.  The day of the court hearing, then when

1    he went to N.B., I paid him $2,300 in cash as well.

2    I remember that very clearly.

3        Q.    And was this for immigration legal services

4    or some other legal services?

5        A.    Other.  Criminal.

6        Q.    I couldn't hear you.  Sorry.

7        A.    Criminal case.

8        Q.    It was a criminal case.  All right.  And this

9    money that you paid came out of the money that N.B.

10   had paid you?

11       A.    Yes.

12       Q.    Okay.  Then before I interrupted you, you

13   said other moneys were paid by you on N.B.'s behalf?

14       A.    Yes.

15       Q.    For other lawyers?

16       A.    Yes.

17       Q.    And who were the other lawyers?

18       A.    Attorney -- there's another attorney in

19   Vernon.  He is right across from the courthouse as

20   well.  And then also Attorney Gina Velez, she handled

21   his part of criminal and his -- tried to do his

22   immigration.  And then Attorney Jessica Richardson,

23   she also received a sum of money for trying to work

24   on his case for immigration.

25       Q.    All right.  Let's do this piece by piece.

1          First of all, you mentioned two other

2     lawyers:  Attorney Richardson and Attorney Velez.

3     These were employees of your staff though, right?

4     A.    Yes.

5     Q.    They were paid for legal service; they were

6     lawyers?

7     A.    Yes.

8     Q.    And they were paid for their work.  But they

9     also did work for other people too, right?

10    A.    Yes.

11    Q.    Okay.  So you didn't hire -- they're not

12    outside counsel like Mr. Collins, right?

13    A.    No.

14    Q.    Just staying with them for just a second --

15    A.    I'm sorry.  I want to -- Jessica Richardson,

16    she has her own practice as well while she was part

17    of the office as well.  So she was handling a lot of

18    people on her own practice as well.

19    Q.    Okay.  But just so it's clear, when you were

20    paying Attorney Richardson and Attorney Velez for

21    doing legal work for your clients, the victims here,

22    they were also doing other legal work for you for

23    other clients, right?

24    A.    Yes.

25    Q.    Okay.  So you can't really focus on you paid

1    them specifically for these clients?

2        A.    Okay.

3        Q.    Now, with regard to other persons who you

4    represented, I use the phrase, I'm sorry, your Honor,

5    in this regard, did you pay other lawyers besides

6    Ms. --

7            THE COURT:  So the question is a little

8    vague.

9            MR. EINHORN:  It is.

10           THE COURT:  So let's focus on the six, just

11   the six.

12           MR. EINHORN:  I meant to do that.  Thank you.

13   BY MR. EINHORN:

14       Q.    With regard to these new six, were there

15   other lawyers besides Mr. Collins and Ms. Noyes for

16   whom you paid money?

17       A.    If you could tell me the name of the client

18   we're referring to, yes, I can tell you the attorney,

19   for example.

20       Q.    All right.  Well, first of all, J.B.T.V.

21           MR. EINHORN:  I apologize for using the names

22   but I think it's necessary.

23           THE COURT:  Well, we'll seal the transcript

24   if necessary.

25           MR. CHEN:  That's acceptable to the

1    government.

2         MR. EINHORN:  Thank you, your Honor.

3    BY MR. EINHORN:

4    Q.    For J.B.T.V., did you pay money for J.B.T.V.

5    to Attorney Noyes?

6    A.    His first name is "Jonathan"?

7    Q.    "Jonathan," yes.

8    A.    Yes.  Yes.  There was payment made for her to

9    review his file, yes, before his application was

10   filed, yes.

11   Q.    And how much did you pay to Attorney Noyes?

12   A.    1,500.

13   Q.    1,500.  And do you know what Attorney Noyes

14   did in this case?

15   A.    She reviewed his file to file the application

16   for the --

17   Q.    I'm sorry.  I missed the end.

18   A.    The application to -- for the visa.

19   Q.    Okay.  There was no entry fee in that case

20   though, right?

21   A.    No.

22   Q.    Okay.  So -- and the 1,500 that was paid came

23   from J.B.T.V.'s moneys?

24   A.    Yes.  But as I mentioned, that sum of money

25   was returned to him because he didn't have -- he

1    needed the places to go to, remember the apartment

2    that I was telling you about.  And I guess I didn't

3    have a way to bring that witness, the one that was

4    present when we gave that money to him.

5        Q.    So it's your testimony that some of the money

6    J.B.T.V. paid was actually returned to him?

7        A.    Yes.  I gave it back to him because he didn't

8    have a place to go to.  He needed a deposit to get an

9    apartment, and I gave him the $2,000 to be able to

10   get his apartment and then be able to get himself set

11   up.  It's not the first, obviously, like -- but we

12   need to focus only on these six so . . .

13       Q.    Okay.  And --

14           THE COURT:  Let's use initials and then you

15   can --

16           MR. EINHORN:  I think it's J.B.T.V.

17           THE COURT:  All right.  You can show the name

18   to the witness and then we can testify by initials.

19           MR. EINHORN:  Okay.  Let me just get some

20   notes that I made, your Honor, if I may, so I do this

21   right.

22           All right.  Obviously the government gave the

23   initials.  I didn't.  So I'm going to improvise as

24   best I can.

25   BY MR. EINHORN:

```
1     Q.    I'm going to show you, if I may, a name

2  E.H.M.

3          MR. CHEN:  That's Mr. Hernandez-Medina who

4  had testified.  That's Mr. Hernandez-Medina who had

5  actually testified, and you can use his name.

6          MR. EINHORN:  Okay.

7  BY MR. EINHORN:

8     Q.    "F.P.S.," for the record.  I'll show you the

9  name that relates to F.P.S.  Don't say the name,

10 please.

11    A.    Yeah, no.

12    Q.    With regard to that particular person,

13 F.P.S., that person claims losses of $16,000 and

14 change, 16,185.  With regard to F.P.S., did you hire

15 any attorneys or pay any government fees?

16    A.    She was -- her case was handled by Attorney

17 Abdul Abdurahman's office.

18    Q.    By who?

19    A.    Attorney Abdul Abdurahman.  He was out of

20 West Hartford.

21    Q.    And so how much of these $16,000 that F.P.S.

22 claims was paid went to that particular attorney?

23    A.    I'm sorry.  I don't remember the exact

24 amounts.  But she paid the money directly to the

25 attorney at -- in the West Hartford office.  She went
```

```
 1    there -- I was present.  Jose was present.  And she

 2    made the payment herself at the office.

 3        Q.    Well, let me do this a different way.

 4              How much did you get from F.P.S.'s moneys?

 5        A.    I'm sorry.  I don't remember the amount.

 6        Q.    Okay.  I'm going to show you another -- and

 7    with regard to a victim A.P.T. and A.M.G., I'm going

 8    to show you the name here just so you can read it but

 9    don't say it out loud, please.  Okay.

10              Do you recognize that name?

11        A.    I recognized "Angel."  Like do --

12        Q.    Don't say it.

13        A.    I'm sorry.

14        Q.    Do you recognize the name?  Yes?

15        A.    I do.

16        Q.    And did you pay any moneys to attorneys on

17    behalf of that particular victim?  There's two of

18    them, actually.

19        A.    Yes.  It was a matter in New York with

20    regards to their child and his criminal case.

21        Q.    And when you say it was an attorney in New

22    York, did you pay the attorney in New York from their

23    funds or did they pay a lawyer in New York directly?

24        A.    No.  I paid that out of the funds.

25        Q.    And how much did you pay out of their funds
```

1    to the lawyer in New York?

2      A.    There were two separate checks.  One was made

3    for 1,200; the other one was, I think, 2,200.  But,

4    again, I don't have the exact figures because I

5    remember giving those to two different attorneys.

6    One was for a criminal attorney.  The other one was

7    related to their child.

8            MR. EINHORN:  Okay.  May I have just a

9    moment, your Honor.

10   BY MR. EINHORN:

11     Q.    I'm going to show you a list of -- a copy of

12   the list of checks, and I'm going to ask you if you

13   can tell the Court whether or not any of these checks

14   relate to the new six victims.  Do you know?

15     A.    Attorney Gina's was mainly for Nestor's case,

16   the one when she was handling for his criminal case

17   in Rockville.

18     Q.    Okay.  Without testifying on this particular

19   document, isn't it true that there is at least one or

20   more of these checks that goes to the Department of

21   Homeland Securities, at least one or more?

22     A.    Yes, there is.

23     Q.    Okay.  And was that your general practice at

24   the time?

25     A.    Yes.

1    Q.    Okay.  And --

2          THE COURT:  But -- okay.  Have you tied it to

3    the six?

4          MR. EINHORN:  Yeah, I don't think she can.

5    BY MR. EINHORN:

6    Q.    You can't tie these particular checks,

7    however, to one of these specific new six, can you?

8    A.    No.

9    Q.    Okay.

10          MR. EINHORN:  I don't offer it, your Honor.

11    BY MR. EINHORN:

12    Q.    So in addition to the lawyers you just told

13    us about, were there any other attorneys that you

14    used for the benefit of these six new victims that

15    you haven't told us about today?

16    A.    I'm sorry.  I don't . . .

17    Q.    Just those?

18    A.    Just these six.  I don't remember, like,

19    anybody else.

20    Q.    Just what?

21    A.    I don't remember anybody else.  I'm sorry.

22          MR. EINHORN:  Thank you, your Honor.

23          THE COURT:  All right.  Thank you.

24          Cross.

25

```
 1                      CROSS-EXAMINATION
 2    BY MR. CHEN:
 3       Q.    Good morning, Ms. Kahn.
 4       A.    Good morning, sir.
 5       Q.    You pled guilty in this case, correct?
 6       A.    I did.
 7       Q.    There was a detailed plea agreement that you
 8    signed, correct?
 9       A.    I did.  But unfortunately --
10             THE WITNESS:  Do I have to answer this?
11             MR. EINHORN:  I think the government is
12    opening the door to areas we don't really need to go
13    into this morning.
14             THE WITNESS:  I don't want to have to --
15             THE COURT:  Well, I mean, I have a signed
16    copy of the plea agreement.
17             THE DEFENDANT:  Yes.
18    BY MR. CHEN:
19       Q.    In your plea agreement, you admitted that
20    you've defrauded 43-plus sets of victims, right?
21       A.    At the time, yes.
22       Q.    So at the time you admitted you had done
23    that, right, that you had defrauded these people?
24             THE WITNESS:  Your Honor, can I choose not to
25    answer?
```

1          THE COURT:  Well, you have a Fifth Amendment

2    right.  But because you've already pled guilty, it's

3    not clear that that right would apply unless there is

4    some other potential criminal liability here.

5          So why don't you confer with Mr. Einhorn and

6    see whether that is appropriate.

7          MR. EINHORN:  I mean, we're sort of -- we're

8    opening the door to entire different areas here.  I

9    think if the government just crosses her on the areas

10   that your Honor was interested in, which I tried to

11   focus on on direct.

12         THE COURT:  Yeah.  Okay.  Why don't we do

13   that.  Let's get down to these six and see what.

14         MR. CHEN:  Okay.

15   BY MR. CHEN:

16   Q.   The point of the government's questions is

17   that you had already agreed to defrauding 43 people.

18   We are only talking about six new victims right now,

19   right?  I'm not saying whether you admit that.

20         But you agree that in that plea agreement,

21   you agreed that you had defrauded 43 sets of

22   immigration victims, immigrant victims, right?

23   A.   I don't want to answer that.

24         THE COURT:  I've got it.

25         MR. CHEN:  You got it.  Okay.

1    BY MR. CHEN:

2       Q.    These payments to these lawyers that your

3    attorney mentioned and that you testified about,

4    that's the first time the government's heard of that.

5       A.    I'm sorry.  That's very unfortunate.

6       Q.    Okay.

7       A.    Very unfortunate that you didn't get to hear

8    a lot.

9       Q.    So -- but your testimony is that you paid

10   these lawyers, correct?

11      A.    I did.

12      Q.    And are any of these attorneys going to be

13   testifying today after you're done here in court?

14      A.    We haven't reached out to them, and my

15   previous attorneys have reached out to these

16   attorneys who did work on these cases.

17      Q.    So does your lawyer have in his case file

18   affidavits that were sworn to and notarized that the

19   lawyer is going to provide to the judge to say this

20   is what the attorneys that you paid money to would

21   say?

22      A.    Attorney Einhorn?

23            THE COURT:  Yeah, just -- I don't know that

24   she can be asked to answer that question.

25            MR. CHEN:  Okay.

1          THE COURT:  I mean, presumably nobody else is

2    testifying.

3    BY MR. CHEN:

4    Q.    There is no other proof of your testimony on

5    these six victims who came forward other than your

6    testimony here today on behalf of the defense, right?

7    A.    The attorneys, those got paid.  You have a

8    lot of the proof.  Like I said, if I was able to get

9    time to be able search my proof.  Otherwise, in the

10   short time that I did, just in these two weeks, which

11   wasn't enough, and I would have been able to provide

12   more proof in payments that were made.

13   Q.    Your lawyer has asked for until Friday to

14   submit a memo.

15   A.    I'm sorry.  I think that's not enough time

16   for the bank to be able to release someone's record.

17   My attorney, I guess, would have to file a different

18   form with the bank to request those records.

19   Q.    So right now as we stand before the Court,

20   the only evidence we have of these payments to these

21   lawyers is your testimony, right?

22   A.    At the moment, along with what Mr. Einhorn

23   says and what he has shown, yes.

24   Q.    The six victims that your lawyer has asked

25   you about, they have told the government, they have

1    told Special Agent Barry of Homeland Security

2    Investigations that they got no benefit from the

3    United States Citizenship and Immigration Services.

4    You understand that, right?  That's why we're here.

5        A.    That's what they said to them, and this is

6    what I'm saying to you.

7        Q.    So is it your testimony that these six

8    people, whom the Court has all the reports on, got

9    some type of benefit from Citizenship and Immigration

10   Services?

11       A.    Edgar Hernandez went through Attorney Noyes

12   which was -- worked for the office and I was the one

13   that brought Attorney Noyes to Edgar Hernandez, and

14   he got benefit and his family got benefit with the

15   attorney that I had been working with, number one.

16           Number -- anybody else that they're -- I

17   don't have the updates for individual's cases because

18   I was not -- like I didn't -- I don't have their

19   records.  I don't know what anyone -- where anyone's

20   cases are standing at this point and what happened

21   with them afterwards.  It's been a long time since I

22   had -- I have no way of knowing where anyone's cases

23   are standing at this point.

24       Q.    You were here when Mr. Hernandez-Medina

25   testified about two weeks ago on January 10th, right?

1    A.    And, your Honor, you saw me.  You thought I

2  was having a panic attack.  No, that was not a panic

3  attack.  That was basically me choking on all the

4  lies that -- what I was hearing, that I could not

5  breathe that this is the same individual that I --

6  that was brought to me by Jose, and I went -- I made

7  sure that this person's family got what they

8  deserved, that they -- he was defrauded by many other

9  people, but I had no intentions of defrauding him or

10  anybody else.

11          So he got the benefit that was -- that he

12  came for by an actual attorney, by somebody that he

13  -- that was paid for.  Attorney Noyes was not -- he

14  didn't go looking for Attorney Noyes.  Attorney Noyes

15  worked -- I was the one that brought him to Attorney

16  Noyes.

17          THE COURT:  So Attorney Noyes worked in your

18  office?

19          THE DEFENDANT:  She worked for the clients

20  but she has her own office separate.  She took a lot

21  of my clients.

22          THE COURT:  Okay.  But what was your

23  arrangement with her?

24          THE DEFENDANT:  She was getting paid an

25  hourly basis or a case by case as she wanted, and

```
1   that's how she was getting paid.
2          THE COURT:  Okay.  And did you have any
3   attorneys working in your office other than Attorney
4   Noyes?
5          THE DEFENDANT:  Yes.
6          THE COURT:  Who else?
7          THE DEFENDANT:  There is a lot of different
8   ones.  Those came in and out.  I mentioned two of
9   them earlier.  But there was a lot of them.  I'm
10  sorry.  I don't have all the records.  I got some
11  things this morning that those were -- but that would
12  have the name of the attorneys.  I'm sorry.  All that
13  I have -- I don't remember everybody's name.  But if
14  I get time, I might be able to go through all --
15  anything that I can find to pull up everybody's
16  information and that would help you understand.
17         THE COURT:  Okay.
18  BY MR. CHEN:
19    Q.    Ms. Kahn, your testimony is that Ms. Noyes
20  worked in your Manchester office?
21    A.    She did not work inside my office.
22    Q.    Okay.  She has her own law practice in
23  Stratford, Connecticut, correct?
24    A.    Yes.
25    Q.    She is actually a licensed lawyer licensed by
```

1  the Connecticut bar, right?

2      A.    I always worked with licensed attorneys.

3      Q.    So she did not -- didn't work for you?

4      A.    She -- Edgar Hernandez is not the only client

5  that she worked for on my -- for the clients, those I

6  worked with.

7      Q.    Mr. Hernandez-Medina testified very clearly

8  two weeks ago that he had to pay Ms. Noyes money to

9  help open his case that you got him nothing on,

10 right?  He said that.  You were right there.

11     A.    And that's why Mr. -- Judge Underhill thought

12 that I was having a panic attack.  But that's not the

13 truth.  That's not truth that -- what he said.  So if

14 you're taking his testimony because what he said and

15 me sitting there and him sitting here, and judge saw

16 me leaning over and trying to say like, hey, you have

17 any -- do you see that I'm sitting right here, what

18 you're saying?  Do you have any idea?  Like, I mean,

19 you're sitting here telling me that you met me

20 through this person and then you paid all this money.

21 All these checks are made out to USCIS.  How do you

22 see me cashing those?  How do you see me keeping

23 those?  How do you see yourself for telling a lie?

24 Like you found Attorney Noyes.  You've been defrauded

25 by like so many other attorneys, and then I'm the one

1    that showed you, like, hey, go to this attorney, she

2    works really well, she has handled my other clients

3    and she will be able to handle this.  His case was

4    also reviewed by Attorney Abdul Abdurahman and he

5    said the same thing.

6         But at that time in 2016, I was taking care

7    of my ill mother-in-law.  She died in May of 2016.

8    The seven months that I was out of the office, I was

9    taking care of her.  That's why I fell off -- like

10   with contact with a lot of people.  I went -- I

11   brought my mother-in-law here.  I was -- she was on

12   dialysis and liver failure.  It's not anybody's

13   problem.  It's not anybody's concern.  But nobody

14   wanted to hear or see the truth here.

15        Edgar Hernandez gave his statement, and I'm

16   telling you that's not the truth.  Whoever that said

17   he got his benefit, like he said he has been here

18   since 2008.  Since 2008, every other attorney,

19   Attorney Murphy's name was mentioned when Mr. Einhorn

20   was trying to point out that every other attorney

21   that took all the money from him didn't do anything

22   for him.

23        And I said, Mr. Hernandez -- I didn't care.

24   It wasn't about the money.  I said, Your children are

25   grown up now.  They have no status, so they can --

1    his daughter is about to get married.  I said, You

2    can still be able to -- your case was approved so you

3    can still be able to get your green card and live the

4    dream that you want.  He hasn't been back to El

5    Salvador for all these years.  He was crying for his

6    parents.

7    Q.    If Special Agent Barry were to contact

8    Attorney Noyes who practices here in Stamford and he

9    asked her, how much money did Khatija Khan pay you to

10   represent Edgar Hernandez-Medina before United States

11   Citizenship and Immigration Services, what would

12   Attorney Noyes say about how much money you paid her?

13   A.    I don't have the exact figure, sir.  I don't

14   have the exact figures, sir.

15   Q.    Can you give the Court a general idea of how

16   much money that happened to be?

17   A.    I'm sorry.  I don't have the exact figure of

18   how much was paid.  That's why I said if my attorney

19   was able to get additional time to get the records

20   from the bank that was paid, in addition to the

21   checks, those were made out to USCIS, those can only

22   be cashed by USCIS, and those are the checks, those

23   were used to pay for Mr. Edgar's fees directly to

24   USCIS, which is immigration, directly.

25          Again, we tried, and unfortunately the time

```
 1    limit, we -- the individual that had the records was
 2    also part of the -- on the victim, and so that's why
 3    I was not able to contact her.  So I was -- we were
 4    trying to figure out how we can get these records.
 5    The only way to get them is the bank, and she is the
 6    only way for us to be able to get the records.
 7        Q.    Did you pay Attorney Noyes more than $1,000?
 8        A.    Yes.
 9        Q.    Did you pay Attorney Noyes more than $2,000?
10        A.    Sir, I'm not going to give you a number that
11    you're looking for because I don't want to be wrong.
12        Q.    I want you to give the Court a general idea,
13    because I will represent to the Court, after this
14    hearing is over, we are going to contact Attorney
15    Noyes to find out the answer to this question to get
16    to the truth of the matter.
17        A.    And same thing, I would like to request for
18    the judge to allow us to be able to get time so we
19    can get more evidence that we need so I can give a
20    number that is appropriate, that's honest.  I can't
21    just give a number.
22        Q.    Can you give the Court a general idea?
23        A.    I'm sorry.  I can't.  I won't.
24              MR. CHEN:  No further questions, your Honor.
25              THE COURT:  All right.  Redirect, anything?
```

1          MR. EINHORN:  No, your Honor.

2          THE COURT:  All right.  Ms. Kahn, you're

3     excused.

4          THE DEFENDANT:  Thank you.

5          THE COURT:  Anything further, Mr. Einhorn?

6          MR. EINHORN:  No, your Honor.  Just as I

7     indicated earlier that I'll submit a brief memoranda

8     to the Court by the end of the day Friday.  I wasn't

9     intending to -- I think I may have heard the

10    government imply this.  I wasn't intending to submit

11    more evidence, just a memoranda.

12         THE COURT:  Very well.

13         THE DEFENDANT:  Judge, may I?

14         MR. EINHORN:  No, you cannot.

15         Excuse me, your Honor.  May I?

16         MR. CHEN:  Your Honor, based on the

17    testimony, I would represent to the Court, we are

18    going to contact Attorney Noyes to get clarity on

19    this factual question, and we will submit something

20    hopefully almost immediately after we speak to

21    Attorney Noyes.

22         THE COURT:  All right.  Do you have anything

23    further?

24         MR. CHEN:  No.  I would just rest on my

25    argument.  I would also indicate that the six

1    individuals who have come forward in this case have

2    substantial credibility given the circumstances of

3    this case, given that they have corroborated their

4    losses with receipts, with bank documents, with

5    checks.  Attorney Barry will vouch for their

6    credibility in this case, and their statements are

7    completely consistent with the other 43 victims who

8    have already come forward and claimed restitution

9    which Ms. Kahn has already agreed, you know, prior to

10   sentencing was an appropriate and a fair amount.

11        I don't believe that the defendant has

12   credibility at this point to make representations

13   that would essentially overturn that which call into

14   question the statements made by the victims in this

15   case.

16        MR. EINHORN:  I don't think I've ever heard,

17   if your Honor please, the burden of proof issue,

18   preponderance of the evidence expanded so far as to

19   include hearsay representations of credibility.

20   That's something only the Court can make after

21   judging witnesses.  So I'd object to his finding.

22        THE COURT:  Well, he's making what amounts to

23   a closing argument.  You're welcome to do the same if

24   you'd like.

25        MR. EINHORN:  Yes, your Honor.

```
 1            Nothing further, your Honor.  Thank you.

 2            THE COURT:  All right.  Thank you all.  If

 3   you possibly can, let's get any submissions by the

 4   close of the business day on Friday.  All right?

 5            MR. CHEN:  Yes, your Honor.

 6            MR. EINHORN:  Yes, your Honor.

 7            THE COURT:  We'll stand in recess.

 8            (Proceedings adjourned, 9:55 a.m.)

 9

10

11            C E R T I F I C A T E

12

13     RE: UNITED STATES OF AMERICA v. KHATIJA KHAN
                 No. 3:19-cr-00314-SRU-2

14

15            I hereby certify that the within and

16   foregoing is a true and accurate transcript taken in

17   the aforementioned matter to the best of my skill and

18   ability.

19

20            /s/ Melissa J. Cianciullo_____

21        MELISSA J. CIANCIULLO, RDR, CRR, CRC
                 Official Court Reporter
22            United States District Court
                 915 Lafayette Boulevard
23               Bridgeport, CT 06604
                   (203) 606-1794

24

25
```