```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
 2

 3  _____ )
    UNITED STATES OF AMERICA,       ) No. 3:19-cr-00314-SRU-2
 4                                  )
                     Plaintiff,     ) January 11, 2023
 5  v.                              )
                                    ) 1:35 p.m.
 6  KHATIJA KHAN,                   )
                                    ) 915 Lafayette Boulevard
 7                   Defendant.     ) Bridgeport, Connecticut
    _____ )
 8

 9              RESTITUTION HEARING - VOLUME I

10  B E F O R E:

11          THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

12

13  A P P E A R A N C E S:

14  FOR THE GOVERNMENT:

15       OFFICE OF THE UNITED STATES ATTORNEY
             1000 Lafayette Boulevard, 10th Floor
16           Bridgeport, CT 06604
             (203) 696-3000
17           E-mail:  harold.chen@usdoj.gov
         BY:  HAROLD H. CHEN, AUSA
18

19  FOR THE DEFENDANT:

20       JONATHAN J. EINHORN LAW OFFICES
             129 Whitney Avenue, Suite 1
21           New Haven, CT 06510
             E-mail:  einhornlawoffice@gmail.com
22       BY:  JONATHAN J. EINHORN, ESQ.

23  PLINIO GHERARDI, INTERPRETER

24

25                   Official Court Reporter:
                     Melissa J. Cianciullo, RDR, CRR, CRC
                     (203) 606-1794
```

```
 1                    INDEX OF EXAMINATION

 2

 3    WITNESS:  EDGAR HERNANDEZ-MEDINA               PAGE

 4    Direct Examination by Mr. Chen                 17

 5    Cross-Examination by Mr. Einhorn               34

 6    Redirect Examination by Mr. Chen               42

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Call to Order, 1:35 p.m.)
 2              THE COURT:  Good afternoon.
 3              MR. EINHORN:  Good afternoon, your Honor.
 4              MR. CHEN:  Good afternoon, your Honor.
 5              THE COURT:  We're here in the matter of
 6    United States v. Khatija Khan.
 7              Could I have appearances, please.
 8              MR. CHEN:  Hal Chen for the United States.
 9    I'm joined here at counsel table with Special Agent
10    Joel Barry of Homeland Security Investigations.  Good
11    afternoon, your Honor.
12              THE COURT:  Good afternoon.
13              MR. EINHORN:  Jon Einhorn for the defendant
14    Ms. Kahn who is sitting with me, of course, at
15    counsel table.
16              THE COURT:  Very good.  All right.  Thank
17    you.
18              And we're here for a restitution hearing
19    regarding six additional victims that the government
20    wishes to have considered.
21              Mr. Chen, do you want to proceed?
22              MR. CHEN:  Yes, your Honor.  The Court
23    already has an abundance of evidence in this case.
24    The restitution hearing is taking place after the
25    court hearings have essentially concluded with
```

respect to the crux of the case.  Ms. Kahn pled

guilty before you in November 2021.  There was a very

detailed factual stipulation.  There was a very

detailed guideline stipulation.  And the Court has

all that.

In addition, the Court went through the whole

sentencing process with Ms. Kahn.  The Court

considered and adjudicated the 43 sets of victims,

totaling, I think it was, $326,212 with respect to

the total restitution amount for those 43 sets of

victims.

Your Honor also has the benefit of the

materials relating to these six additional victims

which were provided to Probation Officer Lauren

Harte, and she has represented to the parties that

all that discovery material was provided to the Court

for your Honor's consideration.

THE COURT:  It was, and I did review it.

MR. CHEN:  Okay.  So we really have an

abundance of evidence already, and I don't want to

overburden the Court with a long protracted hearing

if it's not necessary.

The government has, however, had one witness,

Edgar Hernandez-Medina, who recently was granted LPR

status, which is essentially a green card.  He is the

1    victim that is referenced in an Exhibit C with

2    respect to those exhibits.  He would like to speak to

3    your Honor with respect to his experience with

4    Ms. Kahn and how he was defrauded by her.

5         The other victims represented by the parties

6    in Exhibits A, B, D, E and F, who will all proceed by

7    their initials, those would be with respect to

8    Government's Exhibit A, that would be victim F.P.S.;

9    for Exhibit B, J.B.T.V.; victims for Exhibit D,

10    A.P.T. and A.M.G.  And I just wanted to point out, a

11    couple is considered one victim by the government.

12    Exhibit E is L.P.B. and N.B.; and, in addition,

13    victims E.S. and D.C. with respect to the Exhibit F.

14         Notably, with respect to all these victims,

15    even though time has passed, we're in circa 2023, and

16    most of the offense conduct as alleged by the victims

17    occurred sometime as far back as 2015 or 2016, they

18    still maintain some type of documentary proof more

19    than five, six years before of their interaction with

20    Ms. Kahn because those documents were so vital to

21    them as individuals without legal status here in this

22    country.  And, you know, the ability to show that

23    they had proof that they were attempting to get some

24    type of status in good faith, in compliance with the

25    immigration laws is very important to them.

```
 1              So I think your Honor can consider that as
 2      you consider the evidence here today and the exhibits
 3      as filed.
 4              In addition --
 5              THE COURT:  Let me just pause.
 6              MR. CHEN:  Yes, your Honor.
 7              THE COURT:  With respect to the exhibits,
 8      Mr. Einhorn, is there any objection to me considering
 9      the exhibits in connection with this hearing?
10              MR. EINHORN:  Well, I don't object to the --
11      any of the exhibits.  But I object to what the
12      government seems to be proposing.  Sorry.  I object
13      to what the government seems to be proposing which is
14      that it's already sent the Court the exhibits and it
15      apparently doesn't intend to go farther than that
16      with the exception of a live witness.  I think the
17      government should offer them in the proper fashion.
18      I understand the burden of proof and so forth, but I
19      can't really cross-examine something that's sitting
20      in the Court's file or have my client respond to
21      something in that fashion.  I came here expecting the
22      government, in other words, would be offering your
23      Honor those exhibits.  I won't object to them.  But
24      if it's at least part of the record, part of -- I can
25      make a record of them and address them seriatim.
```

1          THE COURT:  Well, okay.  So I'm going to

2     consider Exhibits A through F as part of the record

3     of this proceeding.  And you're not objecting to

4     that?

5          MR. EINHORN:  Not to the exhibits themselves,

6     as I was saying, no.

7          THE COURT:  So you're basically going to make

8     an argument about whether those exhibits are

9     sufficient?

10         MR. EINHORN:  Yes, your Honor.  I'm sorry.

11    My ears are both plugged this morning -- this

12    afternoon, so I apologize.  I don't mean to be rude.

13         But, yes, we would like to address each one

14    of the claims of the six new victims; and it is

15    likely that my client will testify in that regard

16    too.

17         THE COURT:  Okay.  All right.  Then you've

18    seen the material that was provided to the probation

19    office?

20         MR. EINHORN:  Yes.

21         THE COURT:  And I intend to consider that as

22    well.

23         MR. EINHORN:  Yes.

24         THE COURT:  All right.  Okay.  So I

25    interrupted Mr. Chen.  Let me let him finish and then

1    I'll give you a chance to speak.

2          MR. CHEN:  Okay.  So from my understanding,

3    as a housekeeping matter is Exhibits A and F as

4    appended to the government's submission, are those

5    deemed as admitted?  Or do I have to go through the

6    formalities of --

7          THE COURT:  A through F are admitted.

8          MR. EINHORN:  Yes.

9          MR. CHEN:  No objection.  Okay.  That's

10   great.  I think that will save a lot of time.

11         I do want to point out, as indicated in the

12   government's brief, the rules of evidence don't apply

13   at a sentencing hearing, as the Court is well aware,

14   whether it's a forfeiture hearing or a restitution

15   hearing, and the standard is a preponderance at this

16   point.

17         THE COURT:  Right.

18         MR. CHEN:  And I wanted to mention as well,

19   Agent Barry here is available for the Court if you

20   wish to hear testimony from him.  He is the

21   individual who interviewed all of the victims in this

22   case.  He is the person who investigated this case

23   from soup to nuts and, quite frankly, deserves the

24   government's credit for this investigation.  He will

25   testify to your Honor.

1          And I'd represent to you that the six

2     individuals who are set forth with respect to

3     Exhibits A and F, he found them to be credible, he

4     found their factual accounts to be consistent with

5     the factual accounts of other individuals, the other

6     43 victims that were previously defrauded, and he

7     found that those factual accounts were similar to the

8     modus operandi, the MO, that Ms. Kahn used to defraud

9     these individuals by essentially representing herself

10    as an immigration lawyer when she was not one, by

11    promising some type of relief when none was in the

12    offing or could be possible, the fact that she would

13    claim and demand fees and essentially do nothing.

14          The government has the benefit of the USCIS,

15    Citizenship and Immigration Services, database; and

16    we can tell whether any documents were filed --

17    applications, petitions, for relief were filed by

18    Ms. Kahn on behalf of the victims.  And in certain

19    cases, as pointed out in the government's memorandum

20    at Docket 145, that never happened.

21          So because of that, the government believes

22    and it will essentially proffer to your Honor that

23    these victims outlined in the government's memo and

24    as set forth with the Exhibits A through F have by

25    far cleared their burden beyond a preponderance to

1    prove that they were defrauded by Ms. Kahn.

2           And some of these loss claims, I should point

3    out, are extremely conservative.  The first victim,

4    F.P.S., whose paperwork is demonstrated in Exhibit A,

5    she has essentially, through her legal aid

6    immigration counsel, represented to the government

7    she only wants to proceed for those claims in which

8    she actually has some type of physical paper

9    document, the Western Union money receipts.  She is

10   not seeking to claim any cash for which she no longer

11   has receipts.  And I believe that's, you know, a very

12   considerable and a credible statement for a victim to

13   make in this case.

14          I should also point out, the whole premise of

15   the fraud scheme that was perpetrated by Ms. Kahn was

16   essentially premised on the idea that these people,

17   these victims, mainly Latino and Latina immigrants to

18   the United States without status, would be fearful,

19   would be afraid to come out of the shadows to speak

20   to law enforcement if they were defrauded.  And I

21   think essentially that was the de facto business

22   model and why Ms. Kahn's fraud was so successful.

23          MR. EINHORN:  Well, I would object to --

24   unless we're reopening the case and going back to the

25   pre-plea status, I think have the government go

1    through -- I know your Honor is familiar with it, so

2    I don't know that it's necessary.  But I didn't think

3    we were here to go through the liability aspect, if

4    it were, of this case.

5        MR. CHEN:  The government's point, and I'll

6    be brief, is to say that the claims brought today

7    before your Honor are credible victim restitution

8    claims.  These are not people seeking to get rich

9    quick.  These are not people who decided that they

10   could make some extra money by filing a claim.  These

11   are individuals who saw post-guilty plea of Ms. Kahn

12   that the government, the United States Attorney's

13   Office and the Department of Homeland Security, were

14   taking this matter seriously.  And they were -- they

15   had confidence that if they brought a victim's

16   restitution claim, they would be heard by your Honor.

17       And I only say that not to make any type of

18   rhetorical flourish.  It's just to say it bolsters

19   their credibility.  These are individuals, if they

20   were to go to the Department of Homeland Security

21   otherwise could be put into removal proceedings or

22   they could be potentially even arrested.  So the fact

23   that these people have come forward, I think is --

24   it's significant that they are bringing these claims

25   to your Honor.

1          THE COURT:  Okay.

2          MR. CHEN:  Okay.  So I think I probably -- to

3    start, the government is -- has a translator here.

4    His name is Plinio Gherardi.  He translates on behalf

5    of the Connecticut state court system.  He is an

6    experienced translator.

7          Mr. Hernandez-Medina, his English is quite

8    good, but he would feel more confident if there was a

9    translator next to him to the extent any of my

10   questions were not understandable to him.  And the

11   government seeks your Honor's direction about how the

12   interpreter should be sworn in at this point.

13         THE COURT:  Yeah.  We'll swear him.

14         But before I forget, I just want to make sure

15   -- I want to address Ms. Kahn.  The representation

16   was made that she intends to testify.  And, Ms. Kahn,

17   I just want to make sure you understand that you're

18   not required to testify.  Do you understand that?

19         THE DEFENDANT:  Yes.

20         THE COURT:  And whatever you say could be

21   used against you in this or some other case.  Do you

22   understand?

23         THE DEFENDANT:  I do.

24         THE COURT:  All right.  And, for example, you

25   filed a notice of appeal.  If this case were to come

```
1    back and the government were to be required to
2    reprosecute you, any statements made today could be
3    admitted against you at any future trial or
4    sentencing.  Do you understand?
5              THE DEFENDANT:  I do.
6              THE COURT:  Okay.
7              MR. EINHORN:  Thank you, your Honor.
8              THE COURT:  Yeah.  Have you discussed the
9    decision whether to testify?
10              MR. EINHORN:  We have, your Honor, yes.
11              THE COURT:  All right.  And are you satisfied
12    with Mr. Einhorn's representation of you so far?
13              THE DEFENDANT:  Yes.
14              THE COURT:  Okay.  I just want to be clear.
15              MR. CHEN:  Your Honor, I appreciate that
16    colloquy.  If your Honor could also canvass Ms. Kahn
17    on the potential penalties for perjury and the
18    potential possible fines and possible jail exposure
19    that would be separate from any other -- any jail
20    time in this case, of course.
21              THE COURT:  Well, I'll just -- I'll note that
22    if you make a false statement under oath, you could
23    be prosecuted either for making a false statement or
24    for perjury.  Do you understand?
25              THE DEFENDANT:  I do.
```

```
 1              THE COURT:  And either of those convictions
 2    could subject you to a significant term of
 3    imprisonment.
 4              THE DEFENDANT:  I do.
 5              THE COURT:  All right.  Okay.  Why don't we
 6    swear the interpreter and bring in the witness.
 7              THE INTERPRETER:  Good afternoon.
 8              THE COURT:  Good afternoon.  Would just again
 9    state your fame nor the record, plead.
10              THE INTERPRETER:  My name is Plinio Gherardi.
11              THE COURT:  And you're a qualified
12    interpreter for the state court system in
13    Connecticut?
14              THE INTERPRETER:  Yes.
15              THE COURT:  How long have you been doing
16    that?
17              THE INTERPRETER:  Since late 2020.
18              THE COURT:  All right.  And have you spoken
19    with our witness?
20              THE INTERPRETER:  Not really.  Not
21    extensively.
22              THE COURT:  All right.
23              THE INTERPRETER:  We just spoke about how we
24    -- how he would like to be -- the interpretation to
25    go on, if he wanted consecutive or simultaneous.  He
```

```
 1   expressed that he would like me to whisper the
 2   questions into his ear and he would reply in the
 3   English.  That is the only thing that I discussed
 4   with him.
 5            THE COURT:  Okay.  That's fine.  So you
 6   haven't had any communications difficulties with him?
 7            THE INTERPRETER:  Oh, no.
 8            THE COURT:  Okay.  And do you know of any
 9   other reason you could not truly, justly and
10   accurately interpret today's proceedings?
11            THE INTERPRETER:  No, your Honor.
12            THE COURT:  All right.  I ask that you be
13   sworn, please.
14            THE CLERK:  Please raise your right hand.
15            Do you solemnly swear or affirm that you will
16   interpret the proceedings before the Court in this
17   case justly, truly and accurately, so help you God?
18            THE INTERPRETER:  I do.
19            THE CLERK:  Thank you.
20            THE COURT:  All right.  Thank you.  Let's
21   bring the witness in.
22            MR. CHEN:  The government calls Edgar
23   Hernandez-Medina.
24            THE COURT:  Good afternoon.
25            THE WITNESS:  Good afternoon.
```

```
 1              THE COURT:  Sir, could you please remain
 2   standing and raise your right hand.
 3              THE CLERK:  Do you solemnly swear or affirm
 4   that the testimony you shall give concerning the case
 5   now in question shall be the truth, the whole truth
 6   and nothing but the truth, so help you God?
 7              THE WITNESS:  I will tell the truth.
 8              THE COURT:  Thank you.
 9              THE CLERK:  Please be seated.
10              THE COURT:  Sir, could you please state your
11   name.
12              THE WITNESS:  Edgar, A. is my middle initial,
13   my last name is Hernandez-Medina.
14              THE COURT:  Thank you.  You are welcome to
15   wear your mask, or you can remove your mask if you
16   feel more comfortable.
17              THE WITNESS:  I prefer to take it off because
18   it makes my glasses foggy.
19              THE COURT:  That's fine.
20              MR. EINHORN:  Does your Honor mind if I hang
21   out over here so I can hear the witness a little
22   better?
23              THE COURT:  That's fine.
24              MR. CHEN:  Thank you, your Honor.
25
```

```
 1                    DIRECT EXAMINATION
 2   BY MR. CHEN:
 3      Q.    Mr. Hernandez-Medina.
 4      A.    Yes, sir.
 5      Q.    My name is Hal Chen.  I am a prosecutor for
 6   the United States.  And when you respond, you have to
 7   say a "yes" or "no" because a court reporter is going
 8   to take down your words.
 9      A.    So I have to say "yes" or "no"?
10      Q.    Yes, sir.
11            THE COURT:  More accurately, just --
12            MR. CHEN:  Answer the question.
13            THE COURT:  -- answer the question out loud.
14   Don't nod your head or shake your head.
15            THE WITNESS:  So I don't have to use my hands
16   or my hand?
17            THE COURT:  You can but we need to have your
18   answer out loud.
19            THE WITNESS:  Yeah, my voice?
20            THE COURT:  Yes.
21            THE WITNESS:  Okay.
22   BY MR. CHEN:
23      Q.    And if you could, please speak into the
24   microphone, sir.
25            Sir, could you tell us when you came to the
```

1  United States?

2     A.    I came January 16, 2008.

3     Q.    And how did you come to the United States?

4  Under what type of legal authorization?

5     A.    I came to the United States with my visa

6  H-1B.

7     Q.    And that visa enabled you to work lawfully in

8  this country?

9     A.    Yes.

10    Q.    And was there a point where you wanted to get

11 some type of permanent status in the United States?

12    A.    Yes.

13    Q.    And did you attempt to do that by hiring an

14 immigration lawyer?

15    A.    Yes.

16    Q.    And did you hire other lawyers in order to

17 help you with this effort?

18    A.    Yes.

19    Q.    I'm going to move to the side, and I'm going

20 to ask you if you can identify the individual sitting

21 at the table to my left right here?

22    A.    Uh-huh.

23    Q.    Who is that person?

24    A.    Ms. Khatija Khan.

25    Q.    How did you meet Ms. Kahn?

```
 1      A.    I meet Ms. Khatija Khan back in 2014 by a
 2  friend of mine who -- a guy who I know, Mr. Sameron
 3  (phonetic), Jose Sameron was his name.  He basically
 4  introduced me with her.  He told me that she was
 5  immigration attorney lady who take care of cases like
 6  my one.
 7      Q.    And did you meet Ms. Kahn?
 8      A.    Yes, by her -- by him.
 9      Q.    And what did you want from Ms. Kahn?  What
10  did you want her to do for you?
11      A.    I was trying to put my case or fix my legal
12  status to don't be anymore by H-1B visa, which is
13  considered for the people who are allowed to work
14  right here, to get my green card.
15      Q.    And when you say "green card," you mean you
16  wanted some type of legal permanent status?
17      A.    I'm sorry.  I was trying -- or I was trying
18  to get my legal status in the United States to stay
19  permanently with my family.
20      Q.    With your family too?
21      A.    With my family who came to the United States,
22  because the USA government let me bring them in under
23  H -4, like beneficiary.
24      Q.    And did you communicate directly with
25  Ms. Kahn?
```

1    A.    Yes.

2    Q.    What did she tell you about your desire to

3  get a green card?

4    A.    She says that my case was very easy to do it

5  because I had H-1B visa.  And also at the day when I

6  meet her, I explained her with the previous lawyer, I

7  used to be working with them, I already had labor

8  certification approved.

9    Q.    And so it's in the record.  How do you work,

10  sir?  What work do you do?

11    A.    I'm sorry to ask this because I try to answer

12  you very clear.  What I was doing on those days or

13  what I'm doing right now?

14    Q.    Back in those days.

15    A.    Okay.  I was working at Harken's Market as a

16  manager assistant with them.

17    Q.    And what do you do now?

18    A.    Now I have a business which is the company

19  name is ABC Property Care.  And I'm not working with

20  Harken's Market anymore.  I worked with them until,

21  I'm pretty sure, May of this year -- I mean last

22  year, '22, 2022.

23    Q.    So at one point you had your own property

24  care company?

25    A.    Yes.

1    Q.    When you talked to Ms. Kahn, why did you

2  think she was a lawyer?

3    A.    Because she -- it's what she was saying, and

4  she was fixing things for more people, according to

5  what she represent herself.  And the person who I

6  meet her to -- the person who introduce me with her

7  told me that there was a person with a lot of

8  knowledge in immigration stuff.

9    Q.    Do you know now that she is not an

10  immigration lawyer?

11        MR. EINHORN:  I'm going to have to object,

12  your Honor.  I mean, he's talking to agents, he's

13  talking to U.S. attorney.

14        MR. CHEN:  I can move on.  I withdraw the

15  question, your Honor.

16  BY MR. CHEN:

17    Q.    After you met with Ms. Kahn, starting in

18  2014, did you decide to pay her to help you get legal

19  residency status?

20    A.    Yes.

21    Q.    I'm going to show you what's been admitted

22  into evidence as Government's Exhibit C, and this is

23  page C-1.  Do you see that on your screen,

24  Mr. Hernandez-Medina?

25    A.    Yes.

1    Q.    Can you tell us what that is?

2    A.    It's one of the first payments that I made to

3    Ms. Khatija Khan.

4    Q.    And whose check is this?  Obviously we've

5    redacted out some information.  But can you recognize

6    the letters in the top left-hand corner that are not

7    redacted?

8    A.    Yeah.  That is my name which is there and

9    that's my signature, and that is for a Webster Bank

10   account.

11   Q.    And is this one of the check records that you

12   gave to Special Agent Barry when he came to talk to

13   you?

14   A.    Yes.

15   Q.    And so this is a check of $700 payable to the

16   woman behind me to the left, Khatija Khan, correct?

17   A.    Yes.

18   Q.    I noticed the date is not filled out.  Can

19   you explain that to the judge?

20   A.    By petition of Ms. Khatija Khan, she says to

21   me on those days to leave it like that because she

22   going to start working on my case and then she's

23   going to date it.

24   Q.    And Mr. Hernandez-Medina, if there's any

25   point where it's easier for you or more accurate for

```
 1   you to give an answer in Spanish, you should do that
 2   because the translator can translate it for all of
 3   us.
 4       A.    Thank you.
 5       Q.    I'm going to show you the next page.  This is
 6   Government's Exhibit C-2.
 7             And could you tell us, or do you recognize
 8   these three checks?
 9       A.    Yes, I recognize them.
10       Q.    And were these three checks, copies of them
11   you gave to Special Agent Barry when he spoke to you?
12       A.    Yes.
13       Q.    And what are they?
14       A.    The first check is the immigration fee.
15       Q.    Okay.  Who told you --
16       A.    I'm sorry.  For my son.
17       Q.    And who told you it was an immigration fee?
18       A.    I do know because she told me.
19       Q.    Ms. Kahn?
20       A.    Yes.
21       Q.    Okay.  And there is a second check in the
22   middle for $1,500.  And you notice there is a little
23   writing in the bottom of the left-hand corner.  Can
24   you explain what this second check was for?
25       A.    I wrote that and that's the agreement that
```

```
 1    she told me, the amount for legalizing my wife.
 2       Q.    So the first check at the top is for your
 3    son.  The second check in the middle is for your
 4    wife?
 5       A.    Yes.
 6       Q.    And if you could explain, it seems to be a
 7    word in Spanish in the memo section, in the bottom
 8    left-hand corner.  It starts with -- it appears to be
 9    an "A."  Can you explain to us it is?
10       A.    "Anticipo" means like a deposit payment.
11    That's what it means.  In Spanish, anticipo is when
12    somebody made a deposit.  It's meaning anticipating.
13       Q.    And you also wrote "I-485."  Why did you
14    write I-485?
15       A.    Tell them because the third check, it is the
16    legal fee considered to pay to immigration.  But the
17    second, that was meant for her legal fees for
18    legalizing my wife.  Correct.
19       Q.    And who told you those were legal fees for
20    legalizing your wife?
21       A.    Ms. Khatija Khan.
22       Q.    Tell us about the third check at the bottom
23    of Exhibit C-2.
24       A.    It's this one?
25       Q.    The one at the bottom.
```

```
 1      A.    This is the cost for the application of I-485
 2  form filing.  It's the legal fee for the USCIS.
 3      Q.    And who told you that?
 4      A.    Ms. Khatija Khan.
 5      Q.    I ask you now to go to Exhibit C-3.  Let's go
 6  back.  I'm sorry.  Back to C-2.
 7            These checks, what was the business name of
 8  your business that are written on these checks?
 9      A.    Which one, this one or that one?
10      Q.    Are there different names?
11      A.    The one upwards says "ABC."  That's the name
12  of my company, ABC Property Care, LLC.  That's my
13  company.  The second is JLLL Corp -- JLLAS Corp.
14  That's an entity that Ms. Kahn told me to write the
15  checks to.
16      Q.    Okay.  And I'm just going to read off.  The
17  numbers for these checks, for the record, are 1301 at
18  the top, 1282 in the middle, 1273 on the bottom.
19            None of those three checks have a date on
20  them.  Can you explain why there are no dates on
21  those checks?
22      A.    I would say for two reasons.  The first one,
23  that's when I didn't have enough money.  Ms. Kahn
24  would allow me to write the checks beforehand and
25  then she would write a date when I would have the
```

1    money available because I was working to fund those

2    checks.

3        The second reason, because she would fill out

4    because she would know the date that she would be

5    able to present those checks.

6    Q.    So one of those reasons, the second reason

7    was that Ms. Kahn told you to keep it blank for her

8    purposes?

9    A.    Yes, because she would fill out the

10   applications and she would provide the checks.

11   Q.    I'm going to show you now exhibit page C-3.

12   I'd ask that you look at both of those checks and

13   look up when you're done looking at them.

14   A.    Yes.

15   Q.    And these are -- to move this along, these

16   are two cashier checks.  The one on top is number

17   102161 and the one on the bottom is 102175.  Is that

18   right, sir?

19   A.    Correct.

20       THE COURT:  So with respect to information

21   that's apparent on the face of the exhibit, it's not

22   necessary to ask the witness to confirm it.  You can

23   just note it to me or . . .

24       MR. CHEN:  Thank you, your Honor.

25       THE COURT:  I would note for the record that

```
 1   the three checks on page C-2 are all made out to
 2   JLLAS Corp and all signed by the witness.
 3          The two cashier's checks on page C-3
 4   obviously are bank checks, and we have a series of
 5   checks on page C-4.  Well, two of them, both of them
 6   have the same signature and are made out to Ms. Kahn.
 7          MR. EINHORN:  I think I indicated, we have no
 8   objection to those.  They're full exhibits, I assume,
 9   and they speak for themselves.
10          THE COURT:  And then there is a series of
11   receipts, one of which is on C-4, a number of which
12   are on C-5.  You may want to examine him if he knows
13   who signed those.  But the last two checks on page
14   C-6, again, he signed.  One of them is made out to
15   JLLAS Corp, one of them the payee is left unspecified
16   so . . .
17          MR. CHEN:  Thank you, your Honor.  I
18   appreciate it.
19   BY MR. CHEN:
20     Q.    Government's Exhibit C-3, if you could look
21   at that, sir.  Whose money was that that -- from
22   whose pocket, whose money was that money taken out
23   for those two cashier's checks?  Your money?
24     A.    My pocket.
25     Q.    And we're going to talk a little bit more
```

```
 1    about this later.  But the second check on Exhibit
 2    C-3, was that ever cashed or deposited in a bank?
 3        A.    The second check was returned by immigration
 4    because when it was sent, Ms. Kahn, Ms. Khatija Khan,
 5    sent almost one year after or over one year after.
 6    The immigration department didn't want to accept it
 7    because it took too long.
 8        Q.    And -- okay.  Good.  If we can move to C-4,
 9    the two checks on the bottom of the page, did you
10    write those checks payable to Ms. Kahn?
11        A.    The answer is yes.  We -- I'm sorry for this.
12    Could you please have him to look one little thing
13    here that I'm not able to see with my glasses?  I
14    just want to see one little thing.
15             THE INTERPRETER:  If I could read.
16             THE WITNESS:  Which letter is that?  It's
17    "M," right?  Okay.  Now it's much better for me.
18             MR. EINHORN:  Your Honor, I have no clue what
19    they're talking about.  Could maybe at least one of
20    the witnesses use the microphone?  When he does that,
21    it sounds great.  But between the two of them,
22    they're not using the mike.
23             THE COURT:  Well, the English, whether from
24    the witness or the interpreter, is all that is going
25    to be --
```

```
 1              MR. EINHORN:  Yes.  And that would be fine if
 2   the translator would use the mike, please.
 3              THE COURT:  Okay.
 4              MR. EINHORN:  Thank you.
 5              THE COURT:  I just want to make this as
 6   efficient as we can.
 7              MR. CHEN:  Yes, your Honor.
 8              THE COURT:  So my understanding is that this
 9   is all -- it's part of the agreement by record, or at
10   least absent objection.  Can you do a summary?
11              MR. CHEN:  Sure.
12              THE COURT:  For example, are all the receipts
13   shown in Exhibit C receipts received?
14              MR. CHEN:  Yes, your Honor.  Thank you.
15   BY MR. CHEN:
16     Q.    So, Mr. Hernandez-Medina, you've seen a copy
17   of Exhibit C, all your checks and receipts, before
18   testifying here today?  You've seen that, right?
19     A.    Yes.
20     Q.    And all those amounts of money that are in
21   Government's Exhibit C, that's money you paid to
22   Khatija Khan for what you believed were some type of
23   immigration attorney services, correct?
24     A.    Correct.
25     Q.    I just want to blow up for you, since it's a
```

1   receipt, on Government's Exhibit C-4.  Is this a

2   receipt from Ms. Kahn's company where you actually

3   paid cash?

4       A.    Correct.

5       Q.    And when you made this payment of $3,025, did

6   you say anything to Ms. Kahn about paying cash?

7       A.    Yes.  That will be the last time I would ever

8   give her a cash payment.

9       Q.    Why did you say that?

10      A.    Because I was not -- I didn't have faith that

11  she would -- that she would do -- she would make

12  things correct for my case.

13      Q.    I'm going to ask you now to look quickly at

14  Exhibit C-5 which are a series of receipts to

15  Manchester Family Care, LLC, Mohammed Memon, M.D.  Do

16  you see those?

17      A.    Yes.

18      Q.    And you paid all that money out of your own

19  pocket?

20      A.    Yes.

21      Q.    Why did you pick up all these medical

22  expenses?

23      A.    Because Ms. Khatija Khan would send me to the

24  doctor to present those doctor receipt, doctor

25  receipts as part of the immigration process.  The

1    medical records, that's how they -- what they call

2    it.

3        Q.    So Ms. Kahn told you to do that?

4        A.    Yes.

5        Q.    Okay.  And Government's Exhibit C-6, there

6    are two checks, correct?

7        A.    Yes.

8        Q.    And you paid that money to Ms. Kahn for what

9    you believed were immigration legal services?

10       A.    Yes.

11       Q.    And I've blown up the last check, and I

12   noticed there is a reference to check Khatija Khan

13   102175.  Can you explain that to the judge?

14       A.    That's the check that immigration returned

15   because it was sent too late.  What we did, as

16   requested by Ms. Khatija Khan, to request the bank to

17   return the money of this check to me.

18            And Ms. Khatija wanted this money to her,

19   claiming that she had already paid that money out of

20   pocket.  And since the bank knows me, they returned

21   the money to me, and then I wrote this check to her

22   writing this information and I gave it to madam

23   Khatija.

24            THE COURT:  I understand.  Thank you.

25            MR. CHEN:  You understand.

```
 1   BY MR. CHEN:
 2     Q.    So at some point you stopped dealing with
 3   Ms. Kahn; is that right?
 4     A.    Correct.
 5     Q.    Why did you stop dealing with her?
 6     A.    Because Ms. Khatija hired Noyes Law Office,
 7   okay, and they took the case.  And with all due
 8   respect, I'd like to finish that.  I want to tell you
 9   the story.
10            MR. EINHORN:  I'm sorry.  That answer I
11   didn't hear at all.  "With all due respect."
12            THE COURT:  He wants to finish an answer.
13            MR. EINHORN:  Okay.  Sorry.
14            THE WITNESS:  I got to answer what he asked
15   me.
16            The time passed and Noyes Law contacted me
17   saying that the case could be salvaged, and that's
18   why I decided to continue working with Noyes Law in
19   order to finish the case.  The lawyer's office saved
20   my case, and he was very clear with me when he says
21   due to the long time, they only save in this process
22   me, my wife and my little son but not my two older
23   daughters.  They lost their opportunity to get legal
24   into the United States.
25            THE COURT:  I just want to clarify.  The
```

```
 1   translation was the first part of that was the case
 2   could be savaged or salvaged?
 3            THE INTERPRETER:  Salvaged.
 4            THE COURT:  Salvaged.  Thank you.
 5   BY MR. CHEN:
 6     Q.    So you tried to salvage your case with a new
 7   lawyer?
 8     A.    Yes.
 9     Q.    And that's Attorney Noyes, which I believe is
10   in Stratford?
11     A.    I don't remember exactly where the office is,
12   but it's near this region of Bridgeport.
13     Q.    So the fact that you were able to get your
14   green card for you and some family members, is that
15   because of Ms. Kahn or is that because of Attorney
16   Noyes?
17     A.    Because of Attorney Noyes, and I paid him his
18   attorney fees for the services he provided.
19     Q.    Last question:  How do you feel that Ms. Kahn
20   misled you that she was not an immigration lawyer?
21     A.    Disappointed because my case didn't have the
22   outcome that should have had.
23     Q.    And did you lose approximately 14 to 15,000
24   dollars to Ms. Kahn?
25     A.    Yes, and could be even more because there is
```

```
 1   also cash payments that I could not prove.
 2           MR. CHEN:  No further questions.  Thank you.
 3           THE COURT:  Cross.
 4                       CROSS-EXAMINATION
 5   BY MR. EINHORN:
 6     Q.    Good afternoon, Mr. Hernandez.  My name is
 7   Jon Einhorn and I represent Ms. Kahn.  Okay?
 8     A.    Good afternoon.
 9     Q.    Okay.  Good afternoon.  I'm going to ask you
10   a few questions.  Okay?
11     A.    That's okay.
12     Q.    First of all, before you got to Ms. Kahn, you
13   were with several other immigration lawyers; isn't
14   that true?
15     A.    Correct.
16     Q.    And you claim that they delayed your case and
17   asked for more money, right?  Let me withdraw it and
18   be specific.
19           First you went to an Attorney Kevin Murphy in
20   Springfield, Massachusetts, right?
21     A.    Correct.
22     Q.    And you fired him because you thought he was
23   delaying the process, right?
24     A.    Correct.
25     Q.    And you paid him money and he wanted more
```

```
 1   money, right?
 2      A.    Correct.
 3      Q.    You weren't happy with his services, right?
 4      A.    No.
 5      Q.    Then you went to Attorney Drake in
 6   Washington, D.C., and you weren't happy with Attorney
 7   Drake's services either, were you?
 8      A.    Correct.
 9      Q.    Because Attorney Drake couldn't get you the
10   immigration status that you wanted either, right?
11      A.    That's not correct.
12      Q.    That's not correct.  Why did you fire
13   Attorney Drake?
14            THE COURT:  Mr. Einhorn, what's the relevance
15   of prior counsel?
16            MR. EINHORN:  Yeah, I couldn't agree more.  I
17   thought the government was way off field, and I'm
18   just trying to cover some bases on --
19            THE COURT:  They didn't raise other counsel.
20            MR. EINHORN:  All right.  I'll go right to
21   the point.
22   BY MR. EINHORN:
23      Q.    You hired Ms. Kahn to do your immigration
24   work, correct?
25      A.    Correct.
```

1    Q.    And as we said, that was after you had other

2    -- you tried to do it with other lawyers, right?

3    A.    Correct.

4    Q.    All right.  And didn't you tell the agents,

5    Agent Barry who is sitting over there, that you spent

6    approximately $20,000 on Ms. Kahn?

7    A.    Correct.

8    Q.    And if I add up these checks and the

9    receipts, even the ones, the medical ones, but if I

10   add up all these checks and receipts, it doesn't come

11   anywhere close to $20,000.  Where is the rest of the

12   money?

13         THE COURT:  The government is claiming

14   $14,525 in restitution.

15         MR. EINHORN:  Right.

16         THE COURT:  So there's not a claim for

17   $20,000.

18         MR. EINHORN:  No, your Honor.  This goes to

19   his credibility.

20         THE COURT:  Right.  But he testified already

21   that he made cash payments for which he had no

22   receipts.

23         MR. EINHORN:  I was just about to go there

24   too.

25   BY MR. EINHORN:

```
 1    Q.    How much did you -- let me get right to the
 2  point.
 3          How much did you pay Ms. Kahn in cash
 4  payments?
 5    A.    Many times.
 6    Q.    That's nice.  But how much?
 7    A.    I don't remember.
 8    Q.    Okay.  And with regard to the lawyers in this
 9  case, you also said, you just told us a minute ago
10  that you're also represented by Attorney Noyes in, I
11  think, Stratford it was, right?
12    A.    I told you that I don't know where his office
13  is.  But, yes, I was represented by Attorney Noyes.
14    Q.    Fair enough.  Attorney Noyes.  Ms. Kahn hired
15  Attorney Noyes; isn't that true?
16    A.    Yes.
17    Q.    To work on your case, right?
18    A.    Yes.
19    Q.    And --
20          THE COURT:  Mr. Einhorn, do you want to see
21  about your client?
22          MR. EINHORN:  I beg your pardon.
23          THE COURT:  Your client appears to be having
24  a panic attack.
25          MR. EINHORN:  May I have just a moment.
```

```
 1              THE COURT:  There is water at the table if
 2   you want that.
 3              MR. EINHORN:  Yes, thank you.
 4              She wants to continue, your Honor, if that's
 5   all right.  I guess the record should reflect I asked
 6   her if she wants to take a break or continue and she
 7   wants to continue.
 8              THE COURT:  Very well.
 9              MR. EINHORN:  Thank you.
10   BY MR. EINHORN:
11     Q.   Now, so you just told us that my client,
12   Ms. Kahn, hired or got Attorney Noyes to represent
13   you.  Who paid Attorney Noyes to provide immigration
14   services for you?
15     A.   I paid to the lawyer Noyes office for my
16   represents.
17     Q.   Isn't it true that some of the money you gave
18   to Ms. Kahn was used to pay Attorney Noyes?
19     A.   I'll say something, that I don't know because
20   I don't have any evidence.  The Attorney Noyes
21   mentioned to me that Ms. Kahn has never paid them.  I
22   paid for myself.
23     Q.   How much did you pay the Noyes office?
24              MR. CHEN:  Your Honor, I'm going to object on
25   relevance at this point.
```

```
 1            MR. EINHORN:  This is our claim about
 2   contesting the amounts.
 3            THE COURT:  But how has the amount that he
 4   paid Noyes got anything to do with the amount of the
 5   claim?
 6            MR. EINHORN:  It just goes to the general
 7   amount.  I'm just trying to get to how much Attorney
 8   Noyes got in full for legal services with this
 9   immigration work.  I can move on.  I'll make -- I can
10   make the point through my client.
11            THE COURT:  Are you calling Noyes as a
12   witness so that he could say well, 30,000 and only
13   20,000 came from him?
14            MR. EINHORN:  No, we won't do that.
15            THE COURT:  Yeah, Okay.
16            MR. EINHORN:  I'll move on, your Honor.
17   BY MR. EINHORN:
18      Q.    Now, these checks, sir, that you showed us,
19   there's several in the amount of $1,225, right?  I'm
20   showing you now two of them in the amount of $1,225.
21   Is that the amount of the application fee for the
22   immigration services Homeland Security?
23      A.    This is the payment that I gave to
24   Ms. Khatija, one towards my son and the other one
25   towards my wife for the form I-485.
```

1          THE COURT:  Can we stipulate that the

2    application fee is $1,225?

3          MR. EINHORN:  Yes, if the government would.

4          MR. CHEN:  Your Honor, that was the amount

5    that was claimed by Ms. Kahn.  I don't know how much

6    it was but . . .

7          THE COURT:  Well, okay.  But --

8          MR. CHEN:  If -- the government will

9    stipulate that's what she told him.

10         THE WITNESS:  That was the amount at that

11   time.

12         THE COURT:  Okay.

13         MR. EINHORN:  Thank you.

14   BY MR. EINHORN:

15     Q.  Some amount, whether it's 1,225 or another

16   figure, was used for actual application fees to

17   Homeland Security.  You would agree with me, right?

18         THE COURT:  Forgive me.  But how would he

19   know?

20         MR. EINHORN:  I'm sorry, your Honor?

21         THE COURT:  Forgive me.  But how would he

22   know?

23         MR. EINHORN:  If he knows.  If he knows,

24   he --

25         THE COURT:  Yeah, but you're --

```
 1            MR. EINHORN:  Well, he's been through several
 2     lawyers.  He's in the process.  If he doesn't know --
 3            THE COURT:  He doesn't know, does he, what
 4     money Ms. Kahn forwarded to USCIS?
 5            MR. EINHORN:  Well, he seemed to know enough
 6     that there are two exhibits here with checks made
 7     directly to USCIS.  So he seemed to -- I mean, one
 8     would wonder why he would make checks to the
 9     government if he didn't know they were application
10     fees.
11            THE COURT:  He --
12            MR. EINHORN:  I understand.  He was taking
13     direction from her.
14            THE COURT:  The question is this:  How much
15     money did he pay Ms. Kahn and what portion of that
16     money, if any, did he -- did she use to further his
17     applications.  He doesn't know that.  He doesn't know
18     if she kept the money or sent it along, does he?
19            MR. EINHORN:  No, he does not.  I can see.
20            THE COURT:  So put her on.  If you're going
21     to put her on for that and say, oh, I sent all the
22     money in.
23     BY MR. EINHORN:
24       Q.    Just one last thing then, sir.
25            You told us in your testimony that you got
```

```
 1   another lawyer to salvage your case, you wanted to
 2   salvage your case with a new lawyer.  That's what you
 3   told us, right?
 4      A.   I said clearly that Noyes Law contacted me
 5   after a while and told me that my case could be
 6   salvaged, and even though Ms. Khatija had not paid
 7   them, that they could save my case if I made an
 8   agreement with them to go with him and pay whatever I
 9   got to pay and go to the -- the new medical records
10   again is what he told me.
11      Q.   It's true, sir, that you got to Attorney
12   Noyes because Ms. Kahn hired Attorney Noyes's office
13   to represent you?  She did it.  You didn't find
14   Attorney Noyes on your own?
15           THE COURT:  It's all right.  You don't have
16   to answer.
17           MR. EINHORN:  Nothing further.
18                   REDIRECT EXAMINATION
19   BY MR. CHEN:
20      Q.   Just one question.
21           Sir, would you have hired Ms. Kahn if you
22   knew she wasn't an immigration lawyer?
23           MR. EINHORN:  I'll object to that, your
24   Honor.  That's -- objection.
25           MR. CHEN:  What's the objection for that?
```

```
 1          MR. EINHORN:  This is a restitution hearing.
 2   We're not talking about --
 3          MR. CHEN:  He is the victim.
 4          MR. EINHORN:  Again, it's a restitution
 5   hearing.  We know he's the -- he's here because he's
 6   a victim.
 7          THE COURT:  You asked a ton of questions that
 8   had nothing to do with restitution.  I'll allow him
 9   to do it.
10          MR. EINHORN:  All right.  Yes, sir.
11          THE WITNESS:  Never.
12          MR. CHEN:  No further questions, your Honor.
13   You're excused.
14          THE COURT:  Mr. Chen, I should indicate that
15   my understanding was we were going to be here for an
16   hour, and I do have other matters this afternoon.  So
17   I'm wondering whether we should schedule a second
18   hearing when Mr. Barry and Ms. Kahn can come back and
19   testify.
20          MR. CHEN:  That's acceptable to the
21   government.
22          The government would also essentially rely on
23   its papers.  The other victims, the government has
24   provided a summary from the reports that your Honor
25   has.  You have the receipts.  The government will
```

```
 1   defer to the Court about how much testimony the Court
 2   needs.  I can essentially proffer the factual
 3   predicates that the government thinks is necessary
 4   for purpose of the record.  If Ms. Kahn wishes to
 5   testify, we're happy to come back on another day.
 6              MR. EINHORN:  She does, your Honor, yes.
 7              THE COURT:  All right.  How long do you think
 8   her testimony will take?
 9              MR. EINHORN:  Well, between direct and cross,
10   I'm guessing about 40 minutes.
11              THE COURT:  All right.  What's your schedule
12   for next week?
13              MR. EINHORN:  This week or next week?
14              THE COURT:  Next week.
15              MR. EINHORN:  Thank you.
16              THE COURT:  What about January 19th at 10
17   a.m.?
18              MR. EINHORN:  You know, I'm sorry, your
19   Honor.
20              MR. CHEN:  The government is available, your
21   Honor.
22              MR. EINHORN:  You know, I'm sorry, your
23   Honor.  I can't remember offhand.  I know I have a
24   hearing before one of the districts on the 19th and
25   another in the afternoon, but I can't remember
```

1    exactly which.  Could I report back on that in an

2    hour?

3            THE COURT:  Do you have your phone with you?

4            MR. EINHORN:  I do but there's no one in my

5    office right now.

6            THE COURT:  It's not on your calendar?

7            MR. EINHORN:  I'd have to -- no.  I'd have to

8    check my calendar.  There's no one there right now.

9            THE COURT:  You don't have your calendar on

10   your phone?

11           MR. EINHORN:  She left -- my paralegal left

12   today early.

13           THE COURT:  No.  Your calendar, don't you

14   have a calendar on your phone?

15           MR. EINHORN:  I do, and I didn't update it

16   for next week yet.  It's my fault.  I should have

17   updated it for next week.

18           THE COURT:  When was this hearing scheduled?

19           MR. EINHORN:  I don't remember.  Let me see

20   if I wrote anything.  Oh, here it is.  I have --

21   that's in the afternoon.  I have -- I'm sorry.  On

22   the 18th, I'm with Judge Shea.

23           THE COURT:  I'm talking about the 19th.

24           MR. EINHORN:  The 19th, could we tentatively

25   say the morning of the 19th?  Is that what you were

1  saying, your Honor?

2          THE COURT:  10 a.m. on the 19th.

3          MR. EINHORN:  Okay.  If something -- I'll try

4  to move what I have.  That's fine.

5          THE COURT:  10 a.m. on the 19th.  I will hear

6  from Ms. Kahn.  I'll hear any argument either of you

7  want to make.  I think otherwise the record is

8  complete.

9          MR. CHEN:  Thank you, your Honor.

10          MR. EINHORN:  Okay.  Thank you.

11          THE COURT:  Thank you.  We'll stand in

12  recess.

13          (Proceedings adjourned, 2:47 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3    RE: UNITED STATES OF AMERICA v. KHATIJA KHAN
              No. 3:19-cr-00314-SRU-2

4

5         I hereby certify that the within and

6    foregoing is a true and accurate transcript taken in

7    the aforementioned matter to the best of my skill and

8    ability.

9

10         /s/ Melissa J. Cianciullo_____

11    MELISSA J. CIANCIULLO, RDR, CRR, CRC
              Official Court Reporter
12         United States District Court
              915 Lafayette Boulevard
13           Bridgeport, CT 06604
                (203) 606-1794

14

15

16

17

18

19

20

21

22

23

24

25